IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHERYL MILLER, individually and as administrator of the estate of Jamal Miller, | )<br>)<br>) |
| Plaintiff, | ) Civil Action No.: 10 C 5381<br>) |
| v. | ) Suzanne B. Conlon, Judge<br>) |
| MARCIA KOZEL *et al.*, | )<br>)<br>) |
| Defendants. | )<br>) |

## MEMORANDUM OPINION AND ORDER

Sixteen-year-old Jamal Miller ("Jamal') committed suicide by hanging himself from a bunk bed while in the custody of the Illinois Department of Juvenile Justice ("IDJJ"). His mother, Cheryl Miller ("Miller"), on her own behalf and as the administrator of Jamal's estate, sues IDJJ administrators and other people involved in Jamal's care under 42 U.S.C. § 1983 for deliberate indifference to Jamal's risk of suicide. She also brings a state law claim of medical malpractice. Defendants move for summary judgment.

### I. Background[1]

---

[1] The facts are taken from the parties' Rule 56.1 statements; resort to the record occurred only to resolve a properly disputed fact issue. Defendants Friedenauer, Moore, Jaworski, Finley, and Kozel (the "Illinois defendants") filed a joint motion for summary judgment. Defendants Kersey and Kanneganti each filed a separate summary judgment motion. For convenience, the court included in brackets the docket number of the relevant filing cited to, except when a cited deposition was included multiple times in the record through several parties' exhibits. All genuine factual disputes are decided in Miller's favor, and she receives the benefit of all reasonable inferences. *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009).

1

## A. The Defendants

The defendants occupy various roles in the IDJJ system. Starting at the top, Kurt Friedenauer was the Acting Director of the IDJJ when Jamal committed suicide. Ill. Defs. Facts [137] ¶ 7; Kann. Facts [124] ¶ 10. Dr. Jennifer Jaworski was also an upper-level administrator. She is a licensed psychologist and was the Behavioral Health Services Administrator for the IDJJ, who oversees mental health programs in Illinois' eight juvenile justice facilities. Ill. Defs. Facts [137] ¶ 5; Kann. Facts [124] ¶ 5. She approves transfers from one special treatment unit to another but does not personally perform clinical evaluations. Ill. Defs. Facts [137] ¶ 5; Pl. Resp. to Def. Facts [157] ¶ 5; Kers. Facts [131] ¶ 4.

At the facility level, Bobby Moore was the superintendent at St. Charles. Ill. Defs. Facts [137] ¶ 6; Kann. Facts [124] ¶ 9. He was the highest ranking IDJJ employee at St. Charles and reported to IDJJ Director Friedenauer. Ill. Defs. Facts [137] ¶ 6. Dr. Jolene Harbaugh, a licensed clinical psychologist, was the Treatment Administrator at St. Charles, overseeing the mental health services at St. Charles. *Id.* ¶ 4; Kann. Facts [124] ¶ 5; Kers. Facts [131] ¶ 3. Her job included assigning mental health professionals to provide treatment to the St. Charles youth pursuant to the recommendations of mental health professionals. Ill. Defs. Facts [137] ¶ 4; Kers. Facts [131] ¶ 3. She did not regularly perform clinical work; she did so only if there was no mental health staff available. Ill. Defs. Facts [137] ¶ 4.

Natalie Finley and Marcia Kozel were Juvenile Justice Specialists ("JJSs") assigned to St. Charles. Ill. Defs. Facts [137] ¶¶ 2–3; Kann. Facts [124] ¶¶ 3–4; Kers. Facts [131] ¶ 6. Their jobs entailed watching the youth, conducting searches, communicating issues on the radio,

answering phone calls to the cottages, and other duties involving the youths' security. Ill. Defs. Facts [137] ¶¶ 2–3. The only medical training they had was in CPR. *Id.* ¶¶ 2–3.

Dr. Mallikarjuna Kanneganti, a licensed psychiatrist, was employed by Health Professionals, Ltd. and contracted to perform approximately 18 hours a week of psychiatric services at St Charles. Kann. Facts [124] ¶ 7; Ill. Defs. Facts [137] ¶ 8. He performed initial and follow-up clinical evaluations and psychiatric assessments of youth. Kers. Facts [131] ¶ 5.

The remaining defendant, Dr. Victor Kersey, worked at the Kewanee facility. He is a clinical psychologist employed by Alternative Behavior Treatment Centers, a vendor that contracted with the IDJJ to provide psychological services at Kewanee. Kers. Facts [131] ¶ 2; Ill. Defs. Facts [137] ¶ 9. Kersey was the Clinical Director at Kewanee, which entailed supervising all clinical activities, providing clinical supervision of the clinical staff, and providing clinical services to the youth. Kers. Facts [131] ¶ 2.

### B. Jamal's Entry into IDJJ

When a youth first enters the IDJJ system, he is evaluated in Reception and Classification, located in the St. Charles facility, to determine which of the youth centers he should be assigned to. Ill. Defs. Facts [137] ¶ 12; Kers. Facts [131] ¶ 9. The decision is made by an IDJJ counselor based on a review of the youth's history, current offense, and current mental health needs. Kers. Facts [131] ¶ 9. The counselor refers the youth for a psychiatric examination if indicated by the youth's mental health history and perceived treatment needs. Kers. Facts [131] ¶ 10; Pl. Facts ¶ 72. The psychiatrist determines whether the youth should be placed in a special treatment unit instead of the general population. Kers. Facts [131] ¶ 10. Special treatment units are for youth with a history of mental illness and who need more supervision. Ill.

Defs. Facts [137] ¶ 14; Kers. Facts [131] ¶ 11; Pl. Facts [154] ¶ 95. IDJJ has only two special treatment units, one at St. Charles and one at Kewanee. Ill. Defs. Facts [137] ¶ 14. In addition to the special treatment units, IDJJ has a special, six-month Mental Illness Substance Abuse ("MISA") program at Kewanee for youth who suffer from both mental illness and substance abuse. Kers. Facts [131] ¶ 21. Every IDJJ youth center has a substance abuse program, but MISA is different in that it combines treatment for mental illness and substance abuse. *Id.*; Ill. Defs. Facts [137] ¶ 16. The MISA program has only 18 beds. Ill. Defs. Facts [137] ¶ 13.

Jamal entered the IDJJ system in November 2008. Ill. Defs. Facts [137] ¶ 12; Kers. Facts [131] ¶ 9. At his evaluation in Reception and Classification, Jamal's counselor referred him for a psychiatric evaluation, which was conducted by Dr. Kanneganti on November 24, 2008. Kers. Facts [131] ¶¶ 10, 12; Pl. Facts [154] ¶ 87. In the evaluation, Kanneganti noted Jamal had a history of delinquency, gang affiliations, anger, aggression, fire setting, cruelty to animals, putting a gun to his cousin's head, threatening to kill teachers, a learning disability, a behavior disorder, alcohol and marijuana use, anger problems, and moods swings. Kers. Facts [131] ¶ 13. Jamal's history included five prior psychiatric hospitalizations and three suicide attempts, one by hanging. Pl. Facts [154] ¶ 21. He had been diagnosed in the past with bipolar disorder, major depression, and psychotic disorder. *Id.* ¶¶ 21, 89. But Kanneganti did not diagnose Jamal as bipolar or having major depression because Jamal denied that he had manic or depressive episodes (symptoms of being bipolar) and denied having the symptoms that would qualify him as depressed. *Id.* ¶ 92; Kann. Facts [124] ¶ 13; Kers. Facts [131] ¶ 14. Jamal denied suicidal or homicidal thoughts or plans, and said he had not had suicidal thoughts since his last attempt in June 2008. Kers. Facts [131] ¶ 14. Kanneganti diagnosed Jamal as having a mood disorder, not

4

otherwise specified, a conduct disorder, alcohol abuse, and cannibis abuse. Pl. Facts [154] ¶ 92; Kann. Facts [124] ¶ 12.

Dr. Kanneganti prescribed Prozac (an antidepressant) and Lithium (a mood stabilizer), believing the medications would prevent Jamal's depression and decrease his anger and impulsivity. Kers. Facts [131] ¶ 17; Pl. Facts [154] ¶ 96. Kanneganti felt Jamal needed external controls to regulate his behavior. Pl. Facts [154] ¶ 94. Kanneganti noted Jamal was impulsive and had poor insight. *Id.* ¶ 91. He recommended that Jamal receive group therapy for his anger/impulse controls, substance abuse treatment, and mental health therapy. Kers. Facts [131] ¶ 15. He recommended placing Jamal in a special treatment unit and monitoring him for substance abuse and aggression. *Id.* ¶ 16; Kann Facts [124] ¶ 14; Pl. Facts [154] ¶ 95. Kanneganti felt Jamal's prognosis was poor overall and did not think Jamal would do well in the future. Pl. Facts [154] ¶ 93.

Based on Jamal's need for mental health and substance abuse treatment, Reception and Classification recommended that Jamal be placed in the MISA program. Ill. Defs. Facts [137] ¶ 12. The MISA program had no openings at that time, so Jamal was placed in the special treatment unit at St. Charles until a MISA spot opened. *Id.* ¶ 13. The steps to place Jamal in the St. Charles special treatment unit began with a psychologist who reviewed Dr. Kanneganti's evaluation and discussed the placement with Dr. Harbaugh. Kers. Facts [131] ¶ 18. After Harbaugh determined the placement was appropriate, the recommendation was presented to Dr. Jaworski, at the IDJJ level, who approved it because Jamal met the criteria for placement in the St. Charles special treatment unit. *Id.* ¶¶ 18–19. While at St. Charles, Jamal saw Kanneganti for

5

two followup monthly evaluations, but Kanneganti was not consulted about the transfer from St. Charles. Pl. Facts [154] ¶ 99; Kann. Facts [124] ¶ 15.

**C. Jamal's Transfer to Kewanee**

When a bed in the MISA program became available, Dr. Harbaugh followed through with the original referral to that program. Ill. Defs. Facts [137] ¶ 17; Kers. Facts [131] ¶ 23. She documented the transfer with a memorandum. Pl. Facts [154] ¶ 73; Pl. Ex. O [150] (Harbaugh Memorandum); Ill. Defs. Resp. to Pl. Facts [170] ¶ 73. The memorandum summarized Jamal's history, including his history of three suicide attempts—one with a machete, one by hanging, and one by suffocating himself—and five psychiatric hospitalizations. Pl. Ex. O [150] (Harbaugh Memorandum). The memorandum noted that her counterpart at Kewanee had reviewed the transfer, and it was presented to Dr. Jaworski for approval. *Id.*

Jamal was transferred to the MISA program in Kewanee on February 4, 2009. Kann. Facts [124] ¶ 16. Upon arrival, Jamal went through an intake assessment, brief clinical interview, mental status examination, and a Suicide Probability Scale assessment. Kers. Facts [131] ¶ 24. Jamal signed an antisuicide contract. *Id.* ¶ 24. If he had not signed the contract, he would have been placed on close supervision. *Id.* Dr. Kersey did not participate in Jamal's intake process because he had been in Iraq until May 2009. *Id.* ¶ 25.

Jamal committed discipline infractions while at Kewanee. Kers. Facts [131] ¶ 26. Following each infraction, per Kewanee policy, Jamal was checked into confinement (which appears to be similar to isolation). *Id.* ¶ 27. Because Jamal was in special treatment, Dr. Kersey evaluated him each time he was sent to confinement. *Id.* This was Kersey's only interaction with Jamal, besides passing him in the hallway. *Id.* ¶ 26. For each infraction, Kersey generated a

6

note that identified why Jamal was confined and detailed the interview. *Id.* ¶ 28. During each evaluation, Kersey determined whether Jamal was suitable for confinement placement or needed to be on crisis watch instead. *Id.* ¶ 29. A youth may need crisis watch if he assaults staff or other youth, makes threats or intimidates an individual, or otherwise indicates that he will harm himself or others. *Id.* Kersey never thought it was necessary to place Jamal on crisis watch. *Id.* Jamal had been placed on crisis watch in April 2009 (while Kersey was still in Iraq). Pl. Resp. to Kers. Facts [158] ¶ 29; Pl. Facts [154] ¶ 24. Jamal was placed on suicide watch for five days after a reported assault on another youth and after stating, "I'm going to make it worse for myself." Pl. Facts [154] ¶ 24.

Jamal was not compliant with the MISA program. Kers. Facts [131] ¶ 30. He did not complete his assignments or conduct himself as required in group and individual treatment. *Id.* If a MISA youth is noncompliant with the program, he is placed on a 30-day behavioral contract. *Id.* ¶ 31. If the youth is noncompliant with the behavioral contract, he is sent to Kewanee's special treatment unit for 30 days. *Id.* If the youth successfully completes 30 days in the special treatment unit, he returns to the MISA program. *Id.* Jamal was removed from the MISA program and placed in Kewanee's special treatment unit. *Id.* ¶ 32. When Jamal arrived in the special treatment unit, a psychologist who reported directly to Dr. Kersey began preparing a clinical assessment of Jamal. *Id.* ¶ 33. The purpose of the assessment was to determine the most appropriate treatment for Jamal if he could no longer participate in MISA because of noncompliance. *Id.*

Jamal successfully completed 30 days in Kewanee's special treatment unit and returned to the MISA program. Kers. Facts [131] ¶ 32. But eight days later, Jamal was removed from the MISA program a second time due to noncompliance. *Id.*

A multidisciplinary team determined Jamal should return to St. Charles if he could not participate in the MISA program. Kers. Facts [131] ¶ 34. The multidisciplinary team meeting was chaired by the psychology administrator at Kewanee (not a defendant here) and attended by all twenty-four members of Kewanee's treatment staff, including Dr. Kersey, three doctoral-level psychologists, masters-level therapists, bachelor-level paraprofessionals, behavioral health counselors, activity therapists, and one administrative assistant. *Id.* ¶¶ 34–35. Kersey wrote a memorandum about the team's conclusions. *Id.* ¶ 42. The team used the psychologist's assessments of Jamal conducted in the special treatment unit to determine Jamal's clinical diagnoses. *Id.* ¶ 36; Pl. Resp. to Kers. Facts [158] ¶ 36; Kers. Dep. at 58. The team diagnosed Jamal with conduct disorder, oppositional defiance disorder, mood disorder, alcohol use, and cannabis use. Kers. Facts [131] ¶ 37. Jamal's mood was characterized as stable, and the underlying issue at the time of the assessment was identified as anger aggression.[2] *Id.* ¶ 37; Kers. Dep. at 61–62. Kersey stated that substance abuse treatment was Jamal's primary reason for going to Kewanee.[3] Kers. Facts ¶ 39. At the time the multidisciplinary team met, Jamal was not

---

[2] Miller disputes that Jamal's underlying issue was anger aggression and that his mood was stable. Pl. Resp. to Kers. Facts [158] ¶ 37. Her record cites dispute the correctness and validity of those conclusions, but do not dispute that Dr. Kersey's memorandum from the meeting recorded these conclusions.

[3] Miller disputes that Jamal's primary reason for going to Kewanee was substance abuse treatment. Pl. Resp. to Kers. Facts [158] ¶ 39. She disputes this by pointing to Dr. Kanneganti's initial evaluation of Jamal, his notations of Jamal's mood swings, impulsivity, poor insight, previous hospitalizations and suicide attempts, and his recommendation that Jamal be placed in a

8

actively suffering from psychosis, homicidal ideation, or suicidal ideation.[4] *Id.* ¶ 40. The team agreed that Jamal should be transferred back to St. Charles because he was suitable for a less structured mental health program. *Id.* ¶ 38; Kers. Dep. at 38. Kersey discussed the team's recommendation with Dr. Harbaugh and Dr. Jaworski. Kers. Facts [131] ¶ 43. Both doctors had to agree that Jamal was suitable for the special treatment unit at St. Charles. *Id.* ¶¶ 45–46; Pl. Facts [154] ¶¶ 57, 73.

**D. Jamal's Return to St. Charles**

Jamal was transferred back to the St. Charles special treatment unit on August 5, 2009. Ill. Defs. Facts [137] ¶ 20. Upon his arrival, he was screened for risk of suicide pursuant to St. Charles policies and procedures. *Id.* ¶ 21. At screening, a mental health professional administered the Suicide Probability Scale test, conducted a clinical interview, and referred him to a psychiatrist because of his mental health needs. *Id.* ¶ 22. The screening determined that Jamal was not at risk of suicide at that time.[5] *Id.* ¶ 24. If he had been found to be a suicide risk—or if a staff member at any point thought he was at a higher risk of suicide—he would have

---

special treatment unit. *Id.* (citing Pl. Facts [154] 91, 93–95). Whether Miller has established a disputed fact about Jamal's placement in Kewanee is discussed below.

[4] Miller disputes this fact, but her record cites refer to Dr. Kanneganti's initial assessment of Jamal. Pl. Resp. to Kers. Facts [158] ¶ 40 (citing Pl. Facts [154] ¶ 14–15, 91, 93–95). That assessment, conducted in November 2008, is not relevant to Jamal's mental status in the summer of 2009. Kanneganti did not note any signs of psychosis, homicidal ideation, or suicidal ideation at the initial assessment.

[5] Miller's dispute with this statement is unsupported. She does not attach the IDJJ Policy to which she refers, and her record citations are irrelevant to Jamal's suicide risk at that time. It is true, however, that the Illinois defendants' citations refer to a "risk of suicide" not a "high risk of suicide." *See* Ill. Defs. Facts 23–25. However, it is clear from context that "risk of suicide" refers to a present and imminent danger of suicide.

9

been placed in an observation room, where observation and documentation occurs every five minutes. *Id.* ¶¶ 23–24. The observation rooms all have single beds and no bunk beds. *Id.* ¶ 23.

Dr. Kanneganti evaluated Jamal on August 8, 2009. Kann. Facts [124] ¶ 28; Pl. Facts [154] ¶ 100; Kers. Facts [131] ¶ 53. At that evaluation, Kanneganti knew that the psychiatrist at Kewanee had diagnosed Jamal as bipolar and changed the Lithium prescription to Depakene, another mood stabilizing medication. Pl. Facts [154] ¶ 101. Jamal was also taking Fluoxetine (another name for Prozac). Kann. Facts [124] ¶ 34. The Kewanee psychiatrist noted in a report that Jamal said the Depakene was helping him and that, "Since he has been taking the medication he is doing much better." Pl. Facts [154] ¶ 102. Kanneganti would have read that report and known the Kewanee psychiatrist's findings before he evaluated Jamal. Kann. Resp. to Pl. Facts [164] ¶ 102; Ill. Defs. Resp. to Pl. Facts [170] ¶ 102. Kanneganti assumed the Kewanee psychiatrist saw signs of bipolar disorder, but never contacted the other psychiatrist about Jamal. Pl. Facts [154] ¶ 103. He did not disagree with the other psychiatrist's diagnosis of bipolar, but he did not see any symptoms during his evaluation. *Id.* ¶ 104. Jamal was alert and oriented in time, place, and person, did not have a thought disorder, delusions, or hallucinations, his mood was normal, and he did not report having homicidal or suicidal thoughts. Kers. Facts [131] ¶ 54. Jamal denied having any elevated or irritable mood, hyperactivity, impulsivity, racing thoughts, depression, or neurovegetative symptoms. *Id.*; Kann. Facts [124] ¶ 29. The lack of symptoms could have meant the medications were working. Pl. Facts [154] ¶ 105.

Jamal asked to be taken off his medication. Pl. Facts [154] ¶ 106. He felt he could do well unmedicated. *Id.* Dr. Kanneganti probably would have continued the medication if Jamal had not asked to be taken off, but he agreed to discontinue one medication and to taper off the

10

other (to avoid withdrawal side effects). *Id.* ¶¶ 107–08. Kanneganti believed he could not medicate Jamal without Jamal's consent unless Jamal met the criteria for forced medication. Kann. Facts [124] ¶¶ 36–39. Kanneganti did not see signs that Jamal was gravely disabled or posed a likelihood of serious harm to himself or others, and therefore concluded Jamal did not meet the criteria for forced medication. *Id.* ¶¶ 38–39. Kanneganti explained to Jamal the potential side effects that could result from discontinuing the psychotropic medications and scheduled to see him again in four weeks. *Id.* ¶ 41–42. Jamal died before the follow-up appointment. *Id.* ¶ 42. Miller was not contacted about discontinuing Jamal's medication, even though her consent was obtained when Kanneganti first prescribed Jamal medication and when his medication was changed at Kewanee. Pl. Facts [154] ¶¶ 97–98, 109–10.

**E. Jamal's Suicide**

On August 9, 2009, the cottage that housed Jamal and other special treatment youth was closed due to repairs. Ill. Defs. Facts [137] ¶ 26. All the youth from that cottage were moved to a different cottage, called the Madison cottage. *Id.* ¶ 26. Jamal was placed by himself in a room with a metal frame bunk bed. Pl. Facts [154] ¶ 17. There was a mattress only on the lower bunk; the top bunk was empty. *Id.* Rooms with single beds were available. *Id.* ¶ 16.

On August 31, 2009, JJS Natalie Finley and JJS Sean Kincade worked the afternoon shift at Madison cottage from 2:00 p.m. to 10:00 p.m.. Pl. Facts [154] ¶ 27. Finley was aware that Jamal was in the special treatment unit, which meant that he had mental health issues and may have a mercurial temperament, but she had never met Jamal before. *Id.* ¶ 149; Ill. Def. Facts [137] ¶ 30. According to Finley's deposition testimony, around 4:30 p.m., she asked the youth to line up after dinner to go to the gym. Ill. Def. Facts [137] ¶ 28. Jamal became disruptive, would

11

not get in line, and started to argue with Finley. *Id.* ¶ 29; Pl. Facts [154] ¶ 150. He called her names, cursed, became aggressive, and yelled at her. Ill. Def. Facts [137] ¶ 29. Finley told him to "be quiet," and to "get in line." *Id.* ¶ 31. She did not yell back, call him names, or make any reference to his brother or grandmother as alleged in the complaint. *Id.*; Pl. Facts [154] ¶ 153. She did not know Jamal had a brother. Ill. Def. Facts [137] ¶ 31. Finley denied that Jamal started to cry. Pl. Facts [154] ¶ 153. Her coworker, Kincade, came over and calmed Jamal down so the unit could go to the gym. Ill. Def. Facts [137] ¶ 32. At the gym, Kincade continued talking to Jamal. *Id.* Later that evening, Jamal apologized to Finley. *Id.* ¶ 33. She told him that tomorrow is a new day. *Id.* She meant that everything was fine between them. *Id.* Finley left Madison cottage a few minutes before 10:00 p.m. to get to her next assignment. *Id.* ¶ 34.

JJS Kozel worked the night shift by herself at Madison cottage that night. Ill. Def. Facts [137] ¶ 35. Kozel receives yearly training about suicide from IDJJ; she knew the risk of suicide is prevalent at St. Charles and the youth in the special treatment unit have mental health issues. Pl. Facts [154] ¶¶ 124–25, 128. She knew that there have been prior suicides and suicide attempts at St. Charles, including incidents involving the metal frame bunk beds. *Id.* ¶ 126. Kozel arrived at 10:00 p.m. and was scheduled to work until 6:00 a.m.. Ill. Def. Facts [137] ¶ 35. JJS Kincade told her about an incident between JJS Finley and Jamal that resulted in "points" being taken away from Jamal. Pl. Facts [154] ¶ 129. When Kozel started her shift, the youth were already locked in their rooms. Ill. Def. Facts [137] ¶ 38. She was supposed to conduct safety checks every fifteen minutes, shining a flashlight into each cell to make sure each youth was all right, and fill out a tracking sheet to record the checks. Pl. Facts [154] ¶¶ 130–31. A full round takes her up to six minutes to complete. *Id.* ¶ 134. Kozel was supposed to record the time

12

she conducts a round, and under the time place a check mark next to the name of each youth to show that she did her rounds and checked on the youth. *Id.* ¶ 131. The tracking sheet from that night contains a check mark next to each youth's name at fifteen-minute intervals, ending with the 3:09 a.m. check—the check when Kozel discovered Jamal hanging. *Id.* ¶ 142; Ill. Def. Facts [137] ¶ 39; Ill. Def. Ex. P.

When Kozel started the check at 3:09 a.m., the youth were all asleep and the lights were out. Ill. Def. Facts [137] ¶ 40. Kozel walked down the A wing hall, checking on the youth, then started on the B wing, where Jamal's room was located. Pl. Facts [154] ¶¶ 132–33. Jamal's room was at the end of the hall, the last occupied room. *Id.* ¶ 133. Kozel testified in her deposition that when she arrived at Jamal's room, she looked in the window and saw him in a squatting position. *Id.* ¶ 138; Ill. Def. Facts [137] ¶ 41. She said she thought he was using the toilet, so she quickly turned away. Ill. Def. Facts [137] ¶ 41; Pl. Facts [154] ¶ 138. Kozel went to check the last room on the wing, which was unoccupied. Pl. Facts [154] ¶ 140; Ill. Defs. Resp. to Pl. Facts [170] ¶ 140. As she passed Jamal's room on her way back, she looked in again and thought something looked wrong. Pl. Facts [154] ¶ 141; Ill. Def. Facts [137] ¶ 42. She saw that Jamal's face was against the top of the bunk, and she noticed what looked like a sheet tied around his neck. Pl. Facts [154] ¶ 141; Ill. Def. Facts [137] ¶ 42.

JJS Kozel immediately called an emergency code over the radio and ran down the wing to the cottage's central room, where she motioned to the JJS working in the adjoining cottage to come help. Ill. Def. Facts [137] ¶ 43. The two entered Jamal's room, and the other JJS lifted Jamal while Kozel cut him down. *Id.* ¶ 44. They started CPR. *Id.* A nurse and other staff

13

arrived to help. *Id.* ¶ 45. Paramedics arrived and took over the life-saving efforts, but Jamal was not revived. *Id.*

Before his death, Jamal had posted notes on the walls and door of his cell. A note on the wall was directed to JJS Finley, and it said that she "pushed [him] over the edge." Pl. Facts [154] ¶ 159.[6] A note that read "RIP Jamal Damerco Miller" was affixed to the narrow window on Jamal's cell door. *Id.* ¶¶ 136–37. (The record does not reflect whether the writing was facing in or out.) Kozel testified she did not see a note on the window. *Id.* ¶ 136.

## II. Analysis

Summary judgment is appropriate if defendants establish no material fact is in genuine dispute and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Knight v. Wiseman*, 590 F.3d 458, 462 (7th Cir. 2009). Once defendants have come forward with evidence showing the lack of a factual dispute for trial, Miller must identify record evidence that establishes a triable issue. *Trentadue v. Redmon*, 619 F.3d 648, 652 (7th Cir. 2010). Although Miller receives the benefit of all reasonable inferences and factual disputes are decided in her favor, her evidence must be sufficiently strong to allow a reasonable jury to find for her. *Dale v Potson*, 548 F.3d 563, 568–69 (7th Cir. 2008).

When Jamal was taken into custody, the IDJJ assumed a duty to care for him. *Knight*, 590 F.3d at 463. It violates the Eighth Amendment's prohibition of cruel and unusual

---

[6] The Illinois defendants contest this fact, arguing the referenced Exhibit FF was not attached to the motion. However, the courtesy copy of the exhibits given to the court contains Exhibit FF, albeit erroneously attached at the end of Exhibit EE. A review of the docket reveals Exhibit FF was not uploaded with the rest of the exhibits. Because the court has a copy of the exhibit and defendants have seen the note at issue before, the exhibit will be considered. Miller is advised to supplement the official record on the docket with the exhibit.

14

punishment for IDJJ officials to be deliberately indifferent to Jamal's health and safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To prove a constitutional violation, Miller must show that (1) Jamal suffered an objectively serious harm, and (2) defendants were deliberately indifferent to that risk. *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). The first prong is satisfied; suicide is unquestionably a serious harm. *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). The focus is whether any defendant was deliberately indifferent to that harm.

To show deliberate indifference, Miller must provide evidence that would allow a reasonable jury to find (1) the individual defendant was subjectively aware that Jamal was at risk of suicide, but (2) failed to take reasonable steps to abate that risk. *Collins*, 462 F.3d at 761. Subjective awareness requires that the defendant not only knows of the facts underlying the risk of harm but also actually draws the inference that the risk exists. *Sain v. Wood.*, 512 F.3d 886, 894 (7th Cir. 2008). Negligence in discovering or responding to a risk is not enough to show deliberate indifference. *Minix*, 597 F.3d at 831–32.

The parties contest what level of risk must be shown. Defendants contend the risk must be that Jamal was actively contemplating suicide in the near future. Miller focuses on what could be termed a statistical risk; the presence of several historical risk factors for suicide (including prior suicide attempts, prior psychiatric hospitalizations, and diagnoses of mental disorders), she argues, is enough to show the requisite risk. The problem with Miller's argument is that the IDJJ cannot place every youth with historical risk factors but no present signs of suicide on suicide watch indefinitely. *Cf. Matos ex rel Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003) ("not every prisoner who shows signs of depression or exhibits strange behavior can or should be put on suicide watch"). Without knowledge of an imminent risk specific to Jamal, the argument is

better framed as an assertion that St. Charles' general suicide policy or mental health treatment is inadequate. Historical risk factors are presumably addressed though mental health treatment, and Miller does not contend the overall mental health treatment Jamal received was deficient. For Miller to prevail with respect to actions or omissions specific to Jamal, she must show each defendant was aware Jamal had a present, or imminent, risk of suicide.

### A. The Juvenile Justice Specialists

After JJS Finley and JJS Kozel submitted evidence that they were not deliberately indifferent, it was incumbent upon Miller to provide admissible evidence placing Finley and Kozel's version in dispute. *Harvey v. Town of Merrillville*, 649 F.3d 526, 530 (7th Cir. 2011). Much of Miller's responsive evidence is inadmissible hearsay and cannot be used to establish a genuine dispute. Miller submitted an IDJJ investigator's report detailing the official investigation into the suicide. *See* Pl. Ex. EE [150]. The report contains the investigator's summary of his interviews with other youth in Jamal's unit. Miller purports to use the statements the youth made to the investigator to dispute Finley and Kozel's version of the events surrounding the suicide. She contends the youths' statements may be considered because at summary judgment, evidence need not be admissible in form, only content, and she can call the youths to testify at trial. That would be true if Miller had included affidavits or deposition testimony from the youth. But the principle does not apply to the unsworn written summary of the youths' unsworn statements. *Collins*, 462 F.3d at 760 n.1; *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994). The court therefore disregards Miller's proposed facts ¶¶ 144, 155–57. Similarly, Miller may not use the investigator's report to dispute defendants' proposed facts; the court considers the Illinois defendants' facts ¶¶ 31, 33 undisputed.

16

*1. JJS Natalie Finley*

Miller argues JJS Finley was deliberately indifferent to the risk that Jamal would commit suicide because she deliberately inflamed Jamal and exacerbated his suicide risk. Miller presents no admissible evidence Finley was aware that Jamal was unduly upset by their conflict, that he harbored lingering unresolved feelings from it, or that he was otherwise at an increased risk of suicide on August 31, 2009. Miller has no admissible evidence to contradict Finley's assertion that the confrontation with Jamal ended satisfactorily in her mind when she accepted his apology and that she was not aware Jamal was suicidal. Miller attempts to create a dispute by citing Finley's testimony that she talked to JJS Kincade about the confrontation with Jamal because it was "alarming" to her. Pl. Facts [154] ¶ 151. But, as the Illinois defendants point out, this is not an accurate characterization of her deposition testimony. Ill. Defs. Resp. to Pl. Facts [170] ¶ 151. Finley testified that *after Jamal's suicide*, she spoke to Kincade about the confrontation because it was "alarming" that he had committed suicide on the same day. Finley Dep. at 30–31. As to *the day of the confrontation*, Finley did not deem the confrontation significant enough to note on the log sheet that apprises the next shift of relevant information. *Id.* at 19–20.

Even assuming Miller taunted Jamal during the confrontation, verbal harassment without more does not violate the Constitution. *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000). Miller must also present admissible evidence that Finley was actually aware Jamal's likelihood of suicide increased after the confrontation. But Miller relies only on Jamal's being part of a group of youth who were more predisposed to attempt suicide. This is insufficient. Although hindsight reveals the confrontation had a bigger effect on Jamal than Finley realized, Miller

17